## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| BRANDON KELLEY, ERICK KELLEY, and FREDERICK KELLEY, Derivatively on behalf of Nominal Defendant MACHINE LEARNING INTEGRATION, LLC, <br><br> Plaintiffs, <br><br> vs. <br><br> MAMMOTH ENERGY SERVICES, INC. and COBRA ACQUISITIONS LLC, <br><br> Defendants, <br><br> and <br><br> MACHINE LEARNING INTEGRATION, LLC, a Delaware Limited Liability Company, <br><br> Nominal Defendant. | **Case No.:** <br> **Judge:** <br><br><br> **Jury Trial Demanded** |

## DERIVATIVE COMPLAINT

Plaintiffs Brandon Kelley, Erick Kelley and Frederick Kelley, on personal knowledge as to their own actions and on information and belief as to all other matters, for their Derivative Complaint on behalf of Nominal Defendant Machine Learning Integration, LLC against Defendants Mammoth Energy Services, Inc. and Cobra Acquisitions LLC, allege and state as follows:

## INTRODUCTION

1.      Category 4 Hurricane Maria made landfall in Puerto Rico on September 20, 2017, devastating the island's power grid and electrical infrastructure and killing thousands of people. Although the Federal Emergency Management Administration ("FEMA") immediately allocated hundreds of millions of dollars for emergency restoration efforts, and then allocated additional

resources for the complete restoration and reconstruction of the island's electrical grid, power would not be fully restored until April 2019. This case relates to the brazen scheme of bribery and breach of public trust carried out between certain private contractors involved in the electrical restoration work—Defendants Mammoth Energy Services, Inc. ("Mammoth") and its wholly-owned subsidiary Cobra Acquisitions LLC ("Cobra")—and the federal public official responsible for overseeing that work, a scheme which was the cause of the delay in power restoration. In particular, through the then-President of Cobra, Donald Keith Ellison, Defendants bribed FEMA official Ahsha Nateef Tribble to ensure that restoration and repair projects on the island would be directed exclusively to Cobra. This was to the great detriment of the people of Puerto Rico, who suffered lengthy delay and further power outages at the hands of Cobra, and was also to the detriment of other *more-qualified and approved* contractors, who were authorized and stood ready to perform Hurricane Maria restoration work in Puerto Rico but were permanently sidelined as a result of Defendants' unlawful conduct.

2.    Plaintiffs are Members of Machine Learning Integration, LLC ("MLI"), together comprising a minority ownership interest in that limited liability company. MLI is a technology and systems control integrator for power and energy, telecommunications, and security-based design and engineering services. MLI contracted with Foreman Electric Services, Inc. ("Foreman"), a turnkey electrical infrastructure service company, to assist in restoration of the Puerto Rican power grid in the aftermath of Maria. Foreman was one of three contractors selected in March 2018 by the Government of Puerto Rico, through the Puerto Rico Electric Power Authority ("PREPA"), to rebuild the power grid in accordance with a duly issued request for proposal (RFP77844) relating thereto. MLI's role on the Foreman team was well-known to PREPA

and other government officials in Puerto Rico and MLI stood to earn millions of dollars for the important work it contracted to perform with Foreman on the restoration.

3.      The other two successful bidders for RFP77844 were Defendant Cobra and non-party MasTec Renewables Puerto Rico, LLC. Cobra, for its part, was new to large-scale electric infrastructure restoration. It had been formed less than a year earlier and just months before Hurricane Maria hit Puerto Rico. Cobra was formed as a wholly-owned subsidiary of Defendant Mammoth, which was an oilfield services and fossil fuel company. Cobra was created as Mammoth's first foray into the energy infrastructure business. Although Foreman and its team—including MLI—were both the low-bidder and the most-qualified vendor chosen for the contracted work, their role in the restoration project was delayed and ultimately thwarted entirely by the unlawful acts of Mammoth and Cobra, as described herein.

4.      After the announcement that Cobra, MasTec, and Foreman were the successful bidders for RFP77844, PREPA quickly executed Master Service Agreements with Cobra and MasTec. The Cobra and MasTec MSAs were executed in or before May 2018. Foreman's post-award negotiations with PREPA, however, were delayed for reasons that could not be ascertained. This was particularly perplexing because, at the time of the award, Foreman already had substantial resources on the ground in Puerto Rico. Foreman had performed hundreds of thousands of man-hours of emergency hurricane restoration work under sub-contract with another entity and under the supervision of the U.S. Army Corps of Engineers—work for which Foreman was commended by USACE Project Engineer Ernesto Elias. Although those resources stood ready to deploy immediately, and although Foreman was positioned to help the people of Puerto Rico with their urgent electric grid rebuild, the Foreman-PREPA MSA contracting process ground to a virtual halt.

5.      At the time, Cobra was already performing hurricane restoration work under an October 2017 Emergency Master Services Agreement ("Emergency MSA") that Mammoth CEO and Director Arty Straehla had negotiated and entered into on its behalf with PREPA. The original 1-year Emergency MSA provided up to $200 million compensation to Cobra. PREPA and Mammoth's Straehla would execute several amendments to the Emergency MSA, eventually increasing Cobra's maximum compensation under the emergency restoration contracts to more than $945 million. By late 2018, FEMA reimbursed more than $800 million in Cobra contract costs, and all available emergency restoration work directly approved by FEMA had been awarded to Cobra. Meanwhile, although MasTec and Foreman had been approved for contracting under RFP77844, FEMA's Tribble stymied all work assignments to MasTec and coordinated the delay of Foreman's MSA negotiations in total. This meant that all of the Puerto Rico emergency and power grid restoration work was going to Cobra, consistent with Defendants' secret bribery scheme.

6.      Due to Defendants' and Tribble's interference, Foreman's MSA with PREPA was not finalized until January 29, 2019. The Foreman MSA specified a not-to-exceed value of $250 million. Through amendments, the term of the Foreman MSA was extended from the original end date of June 30, 2019 to December 31, 2019. Despite the Foreman team's expertise, its readiness, its successful bid under RFP77844, and its executed MSA with PREPA, Foreman never received a formal Notice to Proceed on the project; it received *no* work.

7.      On September 3, 2019, federal prosecutors indicted Cobra's President, Donald Keith Ellison, for Conspiracy to Commit Bribery against the United States, Honest Services Wire Fraud, Disaster Fraud, and False Statements. FEMA official Ahsha Nateef Tribble was indicted on charges of Conspiracy to Commit Bribery, Honest Services Wire Fraud, Disaster Fraud, and

Travel Act violations. FEMA official Jovanda Patterson was indicted for acts affecting personal financial conflict of interest and wire fraud. Patterson pleaded guilty to a violation of 18 U.S.C. 208(a) on or about March 11, 2020. Trial for Ellison and Tribble is currently scheduled for May 2022. Earlier this year, Defendants agreed to pay tens of millions of dollars to settle a MasTec lawsuit asserting claims similar to those brought here and a separate shareholder suit alleging that Mammoth inflated its stock price by concealing the bribery scheme alleged herein.

8.      In all, through their bribery scheme, Defendants successfully caused FEMA officials to steer over $1.8 billion of funding to Cobra/Mammoth. This was in lieu of up to $250 million of work that the Foreman team had been approved to perform and for over a year stood ready to commence. Having contracted to perform a substantial portion of Foreman's work for which it had particular expertise, MLI itself would have earned significant revenues from that work. While the people of Puerto Rico and sidelined contractors paid the price, the contracts to rebuild Puerto Rico's power grid were an enormous financial win for Mammoth. That work accounted for 55% of Mammoth's total revenue in the fourth quarter of 2017, and 60% of its total revenue for all of 2018. Plaintiffs bring this action on behalf of MLI to recover from Defendants for their violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq. ("RICO"), and other laws as described herein.

## THE PARTIES

9.      Plaintiff Brandon Kelley is a resident of Pearland, Texas. Plaintiff Erick Kelley is a resident of Houston, Texas. Plaintiff Frederick Kelley is a resident of League City, Texas. Together, Brandon Kelley, Erick Kelley, and Frederick Kelley are minority owners of Nominal Defendant Machine Learning Integration, LLC, owning a collective 40 percent membership interest therein.

10.     Nominal Defendant Machine Learning Integration, LLC is a Delaware limited liability company with its principal place of business in Houston, Texas. The remaining 60 percent membership interest in MLI (aside from Plaintiffs' interest) is owned by S&H Holdings, Inc., which, on information and belief, is owned by Jesse Johnson (Sr.) and is managed and controlled by Jesse Johnson, Jr. S&H Holdings, Inc. is the Manager of Nominal Defendant MLI, with responsibility for MLI's day-to-day management, business, and affairs. During all times relevant to this action, Jesse Johnson, Jr., has held and acted under the authority of Power of Attorney for Jesse Johnson (Sr.) and/or S&H Holdings, Inc., and has further acted as the "Chairman" and/or "Chief of Staff" of Nominal Defendant MLI.

11.     Defendant Mammoth Energy Services, Inc. is a Delaware corporation with its principal place of business in Oklahoma City, Oklahoma. Mammoth is primarily an oil and gas company. It did not enter the energy infrastructure business until the second quarter of 2017, just months before Hurricane Maria, when it formed Cobra Acquisitions LLC as a wholly-owned subsidiary. With Mammoth's assistance, Cobra was awarded two contracts to help restore power to Puerto Rico and rebuild its electrical grid: a $200 million Emergency Master Service Agreement in October 2017, which was amended numerous times to increase the contract's value to $945 million; and a second, $900 million contract in response to PREPA's RFP. In a June 7, 2019 statement, Mammoth characterized its own role in the Puerto Rico electrical restoration project as follows: "Following Hurricane Maria in Puerto Rico and its complete destruction of the island's power grid, Mammoth, through its wholly owned subsidiary Cobra, made a proposal to do reconstruction work to help restore power and rebuild Puerto Rico's grid."

12.     Defendant Cobra Acquisitions LLC is a Delaware limited liability company with its principal place of business in Oklahoma City, Oklahoma. Cobra is a wholly-owned subsidiary

of Defendant Mammoth, formed in the second quarter of 2017, just months before PREPA engaged the company to assist with emergency relief efforts after Hurricane Maria.

## **NON-PARTY RELEVANT ACTORS**

13.     Non-party Foreman Electric Services, Inc. is a Puerto Rico corporation with its principal place of business in Odessa, Texas and/or in San Juan, Puerto Rico. Foreman has a history of experience with large scale electric infrastructure restoration, disaster cleanup, and emergency response.

14.     Non-party Donald Keith Ellison was the President of Cobra at all times relevant to the events described herein. As alleged below, Ellison purchased hotel rooms, meals, airfare, and other inducements for Ahsha Nateef Tribble for access to inside, confidential information and in order to secure contracts and lucrative project assignments for Mammoth and Cobra, to Foreman and MLI's exclusion and detriment.

15.     Non-party Ahsha Nateef Tribble was the Deputy Regional Administrator for FEMA Region II, which serves the states of New Jersey and New York, the Commonwealth of Puerto Rico, the Territory of the U.S. Virgin Islands, and eight Tribal Nations. From around October 2017 to September 2018, Tribble was FEMA's Sector Lead for Power and Infrastructure in Puerto Rico and part of FEMA's response to Hurricane Maria. She was also designated as Recovery Office Deputy Director – Infrastructure Directorate/Disaster Recovery Manager in the Office of the FEMA Federal Coordinating Officer in Puerto Rico during this period. Tribble accepted bribes from Ellison, in the form of hotel rooms, meals, airfare, and other inducements, and in return secured contracts for, and directed work to, Mammoth and Cobra to the exclusion an detriment of Foreman and MLI.

16.     Non-Party Puerto Rico Electric Power Authority is a public corporation and government instrumentality of the Government of Puerto Rico, created by Act No. 83 of May 2,

1941, as amended. PREPA is responsible for electricity generation, power distribution, and power generation on the island, and is the sole provider of electricity for approximately 1.5 million residential, commercial, and industrial customers in Puerto Rico. PREPA entered into Master Service Agreements with Foreman, MasTec, and Cobra. It was prepared to contract with Foreman earlier, and was prepared to assign work to Foreman (and MLI), but was pressured and misled by Tribble, in coordination with Ellison, Cobra, and Mammoth, into directing all work assignments to Cobra.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' RICO claim arises under the laws of the United States. The Court has supplemental jurisdiction over Plaintiffs' other claims pursuant to 28 U.S.C. § 1367(a), as those claims are so related to the RICO claim that they form part of the same case or controversy.

18.    This Court has personal jurisdiction over Defendants Mammoth and Cobra because the federal RICO statute provides for nationwide service of process, and thus also provides a statutory basis for jurisdiction. 18 U.S.C. § 1965(d). The Court also has personal jurisdiction over Mammoth and Cobra by virtue of those parties doing business in this Judicial District and in particular entering into contracts with PREPA in this district and governing work to be performed in this district. These Defendants have also engaged in statutory violations within the District of Puerto Rico.

19.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391. Defendants conducted business related to this matter in this District, and a substantial part of the acts and omissions giving rise to the claims occurred, at least in part, within this District.

## FACTUAL ALLEGATIONS

### *Hurricane Maria*

20.     Hurricane Maria made landfall in Puerto Rico on September 20, 2017. It landed as a Category 4 storm, causing approximately 3,000 deaths on the island.

21.     The deadly hurricane had winds of 175 miles per hour and brought catastrophic devastation including flooding, a lack of resources, and extensive damage to Puerto Rico's electrical power system. All residents of the island were without power. Many areas of Puerto Rico were left without power for months after the hurricane hit.

22.     On the day Maria made landfall, President Donald Trump issued a major disaster declaration for Puerto Rico pursuant to the Stafford Act, designated FEMA-4339-DR, authorizing FEMA to allocate such available disaster relief funds as were necessary to provide disaster assistance to Puerto Rico and cover related administrative expenses. As the government-owned monopoly responsible for electricity generation, power distribution, and power transmission in Puerto Rico, PREPA was tasked with contracting outside parties to restore power to the island and rebuild the power grid.

### *Mammoth/Cobra's Emergency Services Contract*

23.     PREPA initiated an emergency protocol to engage private contractors to immediately begin work restoring power to Puerto Rico. On October 19, 2017, PREPA executed a $200 million Emergency Master Services Agreement with Defendants. Although Cobra was ostensibly the contracting party, it was Mammoth CEO and Director, Arty Straehla who negotiated and executed the contract on its behalf. Cobra was, at the time, a novice to large-scale electric infrastructure restoration. It had been formed only months earlier, as Mammoth's initial endeavor into the energy infrastructure business. The $200 million Emergency Master Service Agreement was amended five times, eventually increasing the contract's value in all to $945,429,800.

24.     The Emergency Master Services Agreement drew immediate scrutiny from the U.S. government and the press for a number of reasons, including: Cobra's lack of prior experience; the absence of a normal bidding process; and because PREPA had also signed a $300 million contract with "Whitefish Energy" – a firm with only two full-time employees, based in the hometown of then-Interior Secretary, Ryan Zinke – just two days prior to entering into the contract with Cobra.

25.     For instance, an October 26, 2017 *Vox* article questioned the contracting process as well as Cobra's capabilities, noting that "76 percent of power users still didn't have electricity."[1] The article noted that "Puerto Rico's public power company has awarded big contracts to US energy companies with no experience responding to a major disaster. Generally, experienced utility crews take on the daunting task of repairing power grids in most US disaster zones. … Neither contract was awarded through a regular bidding process either, though it could be optional under a technical rule from the Federal Emergency Management Agency. Still, the decision to forgo an official process concerns experts and set off alarm bells in Washington." *See* fn. 1, *supra.* According to the article, Mammoth CEO Straehla defended Cobra on a conference call, asserting that Cobra does "infrastructure repairs for utility companies across the Midwest" and "recently completed electrical work in Texas and Florida after hurricanes." The *Vox* article noted that in a follow-up conversation, a Cobra spokesperson "was unable to give further details about Cobra's contracts in Texas and Florida, or any of the clients they have served. The company has not won any federal contracts in the past or handled contracts for the state of Texas, based on a search of government procurement databases." *Id.*

---

[1] *See* Alexia Fernandez Campbell, *Puerto Rico just hired 2 contractors with little experience to fix its broken power grid.* Vox (Oct. 26, 2017). Available at https://www.vox.com/policy-and-politics/2017/10/26/16533512/puerto-rico-powercontracts (last viewed Dec. 23, 2021).

26.     An article published by *The Intercept* on October 31, 2017 raised similar questions about the Cobra's emergency contract with PREPA.[2] It noted that on an October 20, 2017 investor call, Mammoth CEO Straehla claimed that Cobra had "hired an experienced management team with an average of 25 years of industry experience at much larger companies to begin the process of entering the energy infrastructure business," but the article concluded that this was "a bit misleading." It noted that a Mammoth spokesman later clarified to *The Intercept* that it was "four top managers of Cobra that together hold an average of 25 years experience in the utility sector, though [the spokesman] was unable to provide more information as to those executives' names, which companies or utilities they had worked for, or the specific nature of their utility experience. While [the spokesman] and executives on the call said Cobra had been involved in grid restoration work following hurricanes Irma and Harvey, the company currently has no ongoing storm-related contracts outside of Puerto Rico." *See* fn. 2, *supra.*

27.     Although the PREPA emergency services contract was ostensibly with Cobra, *The Intercept* noted that *Mammoth* issued a statement shortly after the contract was executed, in which it asserted "Our leadership team went to Puerto Rico proactively to meet the authorities there and offer our services and expertise." *Id.* Likewise, Cobra President Donald Ellison when questioned "deferred official comment on specific contractual language to Mammoth representatives."[3]

**PREPA's RFP77844**

---

[2] *See* Kate Aranoff, *There's A Shady Puerto Rico Contract You Didn't Hear About.* The Intercept (Oct. 31, 2017). Available at https://theintercept.com/2017/10/31/puerto-rico-electric-contract-cobra/ (last viewed Dec. 23, 2021).

[3] *See* Blake Sobczak and Jenny Mandel, *Echoes of Whitefish Surface in $200M Puerto Rico grid deal.* E&E News Energy Wire (Oct. 31, 2017). Available at https://www.eenews.net/articles/echoes-of-whitefish-surface-in-200m-puerto-rico-grid-deal/ (last viewed Dec. 23, 2021).

28.     In February 2018, PREPA issued a request for proposals, designated RFP77844, to "procure the services of one or more Contractors to become part of the scope of immediate restoration of the PREPA system due to the impact of Hurricane Maria." The RFP was intended to be competitively bid, set a March 2, 2018 deadline for submissions, and identified the minimum qualifications necessary for all applicants. The work to be performed was to be funded by FEMA.

29.     RFP77844 specified that the contractor "shall" acquire certain "required resources," including, but not limited to the following:

      a.      100 Transmission Linemen;
      b.      200 Distribution Linemen;
      c.      20 Civil workers, Damage assessors, heavy equipment operators, 20 logistics, safety and others (with a minimum of sixty percent of the workforce being sourced from the contractor's own workforce);
      d.      Transmission  Digger Trucks;
      e.      Distribution Digger Trucks;
      f.      Auger Trucks;
      g.      Distribution Bucket Trucks;
      h.      Transmission Bucket Trucks;
      i.      Pick ups;
      j.      Dozer, semi tractors;
      k.      60 and 30 Ton Cranes; and
      l.      Semi Tractors and haul See RFP, Appendix A - Technical Specifications, at 1.1 "Scope of Phase 2 and Phase 3 Restoration".

30.     Among other things, all applicants were required to have successfully completed "at least one (1) of each type of similar project in the last three years . . .ending December 31, 2017[,]" and to provide references, including references from utility companies, speaking to that experience.

31.     The three project types included in RFP77844, each of which was defined in detail, were: (1) transmission line projects; (2) distribution line projects; and (3) substation or switchyard projects.

32.     RFP77844 was intended to provide PREPA with one year of contractor service.

33.     RFP77844 set forth "grading criteria" for all applicants, breaking down the weight to be attributed to each factor in assessing applicant bids. "Quantitative factors," such as pricing competitiveness, discount proposals, schedule and method descriptions, and mobilization capacity were weighted at 65 percent; while "qualitative factors," such as background and financial information (including audited financial statements for 2015 and 2016), company reputation, and previous experience were weighted at 35 percent.

34.     Foreman submitted a 63-page proposal, in which it specified that it would provide over 550 linemen and support personnel and over 350 pieces of necessary equipment.

35.     In Section 5.3, "Account Management," Foreman provided a detailed mobilization and demobilization plan, which included PREPA paying for both.

36.     The Foreman proposal noted that "Foreman Electric has transmission equipment in Jacksonville, FL at the port. Foreman Electric has over $5 million dollars worth of specialty power line tools in Puerto Rico, ready to work. Foreman Electric has over 400 line workers, experienced on PREPA's system, awaiting notice for re-deployment. In short, upon execution of a contract with PREPA, Foreman Electric has the ability to proceed within 48 hours."

37.     On or about March 29, 2018, PREPA published a notification indicating that three companies were "selected as the evaluated bidders that substantially fulfill the specifications, terms, and conditions, and awarding expectations for the RFP77844[.]" Those companies were Cobra, MasTec, and Foreman.

38.     Foreman was well-positioned to complete the necessary work. It had over 60 years of relevant expertise, including a long history of experience with large scale electric infrastructure restoration, disaster cleanup, and emergency response efforts. Cobra had none of this experience. Cobra was the recently-formed subsidiary of an oil and gas fossil fuel interest, Mammoth.

13

39.     In addition, Foreman had assembled a state-of-the-art team to perform the restoration and power grid reconstruction work. That team included MLI, a company with expertise in computer learning and integration technology, offering computer systems the ability to learn from each other—including the computers used for intelligent digital power grids. MLI personnel had the distinction of having executed the largest single design for a U.S. government integration project in history. The MLI project management team and advisory board included a number of distinguished Ph.D. engineers and retired military officials with experience in state-of-the-art electrical grid architecture and emergency disaster recovery efforts. Other members of the Foreman team were International Business Machines (the world's largest cloud architecture and smart IT firm), ABB Information Systems, Ltd. (a leading smart grid engineering firm with expertise in enterprise design and system planning for smart grid and electrical energy management systems and software architectures), Lamar University Center for Innovation, and Atlys Global (a disaster and infrastructure finance company).

40.     At the time, Foreman also had completed more than 250,000 man-hours of power restoration, repair, and construction work in Puerto Rico since October 2017. It had done this work as sub-contractor, under the supervision of the U.S. Army Corps of Engineers. In February 2018, USACE Project Engineer Ernesto A. Elias wrote to Foreman's David Kettle, commending Foreman's work in Puerto Rico and specifically recognizing "exceptional customer service going the extra distance to satisfy the end users and customers" and "first-rate experience in one of the most dangerous fields in construction, high power."

41.     Notwithstanding Foreman's expertise in the type of work to be completed (including its specific experience with Puerto Rico's power grid) and notwithstanding that Foreman had substantial assets on the ground in Puerto Rico for immediate project deployment,

the process of executing a contract between Foreman and PREPA became mired in a delay the reason for which would only become apparent after the veil was lifted on Defendants' bribery scheme.

42.     Upon being qualified as a successful bidder, Foreman began work immediately to execute a contract with PREPA. The RFP required mobilization within 15 days of the successful bid announcement. Thus, within approximately one week, Foreman assembled its team (which included MLI), and commenced contract negotiations with PREPA. Foreman was prepared to mobilize in a timely fashion and ultimately incurred significant mobilization costs. A draft of the Foreman master service agreement existed before the end of April 2018, though no contract would reach approval for months.

43.     By mid-May, however, Foreman was instructed by the PREPA procurement liaison manager Delis Zambrana to reformat its price schedule from a detailed "per man per expense" basis into a blended rate formula in order "to look like the other companies" rates, which were being submitted to the Financial Oversight and Management Board for approval. This curious instruction was given in spite of the fact that the existing Foreman price schedule format had been negotiated and approved by PREPA legal officials. In retrospect, this was a move towards less transparency in the contracting rates, which was to the detriment of Foreman, which had been by far the lowest bidder for the work.

44.     The procurement officer informed Foreman the following morning that its contract was in the process of being signed by the CEO of PREPA. This turned out to be false. On May 30, 2018, PREPA CEO and Executive Director Walter Higgins informed Foreman CEO Bront Bird that although PREPA had every intention of signing the Foreman contract, the contract had not yet been sent to the Financial Oversight and Management Board—a necessary approval step before

execution. At the same time, master service agreements had been processed and executed between PREPA and Cobra (for $900 million) and between PREPA and MasTec (for $500 million).

45.     Meanwhile, Cobra had continued to perform work under its $945 million Emergency Master Services Agreement. Its work was not without error. According to *The Intercept*, in late April 2018, a bulldozer operated by one of Cobra's subcontractors accidentally triggered an island-wide blackout.[4] The same subcontractor was blamed for a different blackout two weeks earlier that had affected some 870,000 homes. *See* fn. 4, *supra*. The article referred to the emergency contract—"reminiscent of" the "novice Montana-based firm Whitefish Energy Holdings" contract—"an obvious boon for companies like Cobra," though not the same for island residents. It quoted the vice president of the PREPA utility workers union, Freddyson Martinez, as saying "there will be more Whitefishes and more Cobras – more animals of those species – lurking around trying to bite again." *Id.*

46.     The Cobra Master Service Agreement was executed with PREPA on May 26, 2018. Like the Emergency MSA, it was executed by Mammoth CEO Straehla. The MasTec Master Service Agreement was executed May 29, 2018. So, while the RFP bid rules required Foreman to mobilize within 15 days of the announcement of its successful bid, and while Foreman was prepared to do so, it was instead still stuck in the contracting process at the end of May, and in the dark about why its contract had not yet been sent to and approved by the Financial Oversight and Management Board. When Foreman inquired again about the delay with a PREPA procurement officer, and questioned why its contract had not timely been submitted to the Financial Oversight

---

[4] *See* Kate Aronoff, *Controversial Contractor Was Behind Island-Wide Blackout, As Puerto Rico Debates Full Privatization*, The Intercept (Apr. 23, 2018), available at https://theintercept.com/2018/04/23/puerto-rico-power-outage-prepa-privatization/ (last viewed Dec. 23, 2021).

and Management Board, the procurement officer informed Foreman that "FEMA" had instructed PREPA to hold onto the contract.

47.     In June of 2018, Foreman CEO Bront Bird met with PREPA Board Chairman Ernesto Sgroi to discuss the frustrating lack of contract progress. Sgroi informed Bird that FEMA—in particular Ahsha Tribble—had been pressuring PREPA to allocate contracts and funding as she (and, ostensibly, FEMA) saw fit. Bird specifically discussed with PREPA the roles of the various constituents of the "Foreman Team," including Foreman, MLI, ABB, and IBM. In or about the same timeframe, MLI prepared detailed memoranda and planning documents which, on information and belief, Foreman shared with PREPA in conjunction with its contract negotiations. These materials, including a "Cyber Security Machine Learning Agnostic Intelligence" memo and an "Executive Summary on RFP Award 77844," prominently identified and discussed the roles of the various Foreman "team" members, including MLI. The latter outlined the work MLI and other sub-contractors would perform and illustrated how the updated power grid would operate after MLI completed its work.

48.     While Cobra began to perform work under its newly executed MSA with PREPA, MasTec was first told to commence work, with a formal Notice to Proceed on June 5, 2018, and then told to stop, with a Notice of Suspension just two days later, on June 7. Foreman remained stuck in the contracting process until its contract finally was approved by the Financial Oversight Management Board in January 2019. The Foreman MSA was ultimately executed on January 29, 2019. It called for work not to exceed $250 million and was to be effective January 29, 2019 through June 30, 2019.

49.     Foreman initiated a massive mobilization effort, but still there was no work. Having still not received a Notice to Proceed with work, Foreman's Bird wrote to the Governor of Puerto

Rico, the Hon. Ricardo Rosello Nevares, on May 23, 2019. In that letter, the Foreman CEO pleaded

for the assistance of Governor Rosello Nevares in finding a mutually beneficial path forward for

efforts to commence on the permanent work portion of the Puerto Rico power grid. Bird described

the series of events that had left Foreman—the lowest bidder on RFP77844—sidelined during

eight months of "little to no communication" about its contract. Bird outlined the plan to rebuild

the power grid, identifying and highlighting the significance of the Foreman team members,

including MLI.

50.     The Foreman-PREPA MSA was later amended to extend through December 31,

2019. Nonetheless, Foreman never received a Notice to Proceed with *any* work on the contract.

Likewise, MasTec never received any work. Instead, all of the emergency work and all of the

permanent rebuild work went exclusively to Cobra.

51.     Power was not fully restored to Puerto Rico's electrical grid until April 2019,

despite FEMA's allocation of hundreds of millions of dollars to emergency restoration efforts and

later allocation of over a billion dollars in funding for approved contractors under RFP77844. Had

all work not been funneled to Cobra, to the exclusion of the Foreman team and MLI, power could

have been restored more quickly, more effectively, and at a cheaper cost to the taxpayers.

### *Federal Indictments Expose Defendants' Secret Bribery Scheme*

52.     The restoration of power to Puerto Rico was delayed, at least in part, because the

FEMA administrator responsible for assigning restoration and repair projects on the island, Ahsha

Tribble, accepted bribes from Cobra President Donald Ellison to delay contracting approval for

Foreman and to direct all electrical grid restoration work in Puerto Rico to Cobra, to the exclusion

of Foreman and MLI.

53.     On September 3, 2019, a Grand Jury returned an indictment initiating criminal

proceedings in the United States District Court for the District of Puerto Rico against Tribble,

Ellison, and Tribble's FEMA colleague Jovanda R. Patterson. *See* Indictment in Criminal Case No. 19-00541-FAB, *United States v. Ahsha Nateef Tribble, Donald Keith Ellison, and Jovanda R. Patterson* (hereafter, the "Indictment," a copy of which is attached and incorporated herein as **Exhibit 1**). The Indictment comprised fifteen counts including Conspiracy to Commit Bribery, in violation of 18 USC §§ 371 and 201; Honest Services Wire Fraud, in violation of 18 USC §§ 1343 and 1346; Disaster Fraud, in violation of 18 U.S.C. § 1040; and False Statements, in violation of 18 U.S.C. § 1001. The charges related to Cobra's contracts with PREPA, including RFP77844. Each count was based on the allegations that Ellison conspired with Tribble to direct valuable restoration work on Puerto Rico's electrical grid to Cobra. As Deputy Regional Administrator for FEMA, Region II, Tribble was responsible for planning, directing, and coordinating all projects in the region, as well as making day-to-day operational management decisions. As Recovery Office Deputy Director – Infrastructure Directorate, Tribble was responsible for approving requisitions for supplies and services and approving Public Assistance Project Worksheets up to $200 million. Ultimately, Tribble was the gatekeeper for all public funds at FEMA's disposal for recovery work in Puerto Rico.

54.     The Indictment also alleged that former FEMA official (and then-current Cobra employee) Jovanda R. Patterson negotiated employment with Cobra and a Cobra affiliate from March to July 2018, while participating as a FEMA employee in a Past Performance Evaluation for Cobra Logistics LLC as a part of a vendor bid process. Patterson was charged with performing acts affecting personal financial conflicts of interest, in violation of 18 U.S.C. § 208, and with and Wire Fraud, in violation of 18 U.S.C. § 1343.

55.     The Indictment revealed for the first time the secret bribery scheme among the Defendants and others to enrich themselves and their co-conspirators through Ellison giving things

of value to Tribble who in return "performed official acts through her FEMA employment to advance Cobra's interests and secure favorable treatment for Cobra as needed and as specific opportunities arose in connection with the contracts signed between PREPA and Cobra, the payment of work billed under the contracts, and work assigned by PREPA to Cobra pursuant to those contracts."

56.     The Indictment further alleged that Tribble, in exchange for receiving things of value from Ellison, "performed official acts as needed and as specific opportunities arose on behalf of Cobra, including but not limited to, influencing, providing advice to, and exerting pressure on PREPA executives, including but not limited to the Chief Executive Officer, and Directors of different PREPA divisions, so that PREPA would accelerate payments to Cobra, assign tasks to Cobra instead of PREPA employees, and use Cobra in restoration tasks to the exclusion of other contractors."

57.     Ellison bribed Tribble in order to induce her to abuse her position to steer hundreds of millions of dollars in profits to Defendants, to the detriment of and in prejudice to Foreman's contractual rights and expectations with PREPA, by providing Tribble, according to the Indictment, at least the following:

a.     A helicopter tour over Puerto Rico on or about February 7, 2018;
b.     Assistance procuring a place to live in New York in or about February 2018;
c.     The negotiation and hiring of Patterson by Cobra Energy starting in or about March 2018 and culminating in July 2018;
d.     Hotel accommodations in Fort Lauderdale, Florida on or about July 17 to July 18, 2018;
e.     Airfare from Miami to Orlando for travel on or about July 20, 2018;
f.     First class airfare from San Juan to New York for travel on or about September 22, 2018;
g.     Personal security services in or about November to December 2018;
h.     Roundtrip airfare from Washington DC to Charlotte for travel on or about November 29, 2018 to November 30, 2018;
i.     Hotel accommodations in Charlotte on or about November 29·30, 2018;
j.     Access to and use of Ellison's credit card; and

k.       Access to and use of an apartment located in San Juan, Puerto Rico.

58.      Tribble and Ellison were in constant communication between December 2017 and December 2018, if not longer. The Indictment alleges that Ellison concealed Defendants' bribery scheme by paying Tribble with credit cards in the name of Donald Keith Ellison in his capacity as Cobra President and executed the scheme by transmitting wire communications in interstate commerce using his email address with the email domain mammothenergy.com. With respect to Patterson, Ellison arranged the employment position at Cobra in order to satisfy Tribble. When Tribble emailed Ellison regarding her concern that Patterson would not be able to afford a move to New York, Ellison confirmed that he would "take care of" Patterson. Ex. 1. According to the Indictment, six weeks later, on June 1, 2018, Cobra's Director of Human Resources emailed Patterson a letter offering her employment at Cobra Logistics, at an annual salary of $160,000.00, with a bonus of up to 30% of her salary, plus per diem. All of this amounted to more than double her FEMA salary.

59.      On March 10, 2020, Patterson pleaded guilty to the felony of committing acts affecting personal financial conflicts of interest in violation of 18 U.S.C. § 208. Ellison and Tribble are scheduled for criminal trial in May 2022.

60.      Due to the unlawful conduct set forth herein by Defendants, Foreman's MSA contracting process was delayed and Foreman never received a Notice to Proceed with work it had been approved to do and for which it was the lowest bidder and was well-qualified to perform. Foreman consequently received no work arising from its $250 million Master Service Agreement.

61.      Accordingly, MLI too never received any of the work it was contracted to perform as a sub-contractor of Foreman.

62.     Defendants, by contrast, have to date received over $1.1 billion in taxpayer money from FEMA payments, which were procured by fraud, to the detriment of MLI.

63.     The corrupt relationship between Tribble, Mammoth, and Cobra caused Foreman and MLI to forego other opportunities and to incur millions of dollars in mobilization costs to meet their obligations under the RFP77844.

### MLI'S Contractual Role in the Project

64.     On or about April 17, 2018, MLI entered into a contract with Foreman to perform work and provide services in connection with Hurricane Maria relief efforts and electrical grid restoration work in Puerto Rico.

65.     Pursuant to the MLI-Foreman contract, Foreman assigned exclusively to MLI certain scope of work in connection with its successful RFP77844 bid. Under the contract, MLI was to receive 75% of all revenue for services it performed on the project. MLI would have performed a substantial portion of the work for which Foreman was approved and contracted. MLI would have received 75% of the Foreman revenues for that work, which would have amounted to millions of dollars.

### DERIVATIVE LAWSUIT ALLEGATIONS

66.     Plaintiffs bring this action derivatively in the right and for the benefit of MLI to redress injuries suffered by MLI as a direct result of Defendants' violations of law. MLI is named as a nominal defendant in this case solely in a derivative capacity. Prosecution of this action is in the best interest of MLI.

67.     Plaintiffs were, at all times relevant to the occurrences described herein, MLI shareholders, owning a 40 percent interest in the company. Plaintiffs remain 40 percent shareholders to this day.

68.     Plaintiffs, through counsel, made demand on Jesse Johnson, Jr., who acts as the Chairman and/or "Chief of Staff" of MLI, and who conducts the business of MLI under power of attorney for the majority owner and Manager, to investigate and bring this action against Defendants on behalf of MLI. Mr. Johnson demanded a personal consulting agreement and payment in order to proceed with such an action and threatened to withhold information that would assist Plaintiffs in pursuing this claim if he did not receive a personal consulting fee.

69.     When Plaintiffs communicated to Mr. Johnson that they would not hire him or pay him as a consultant, Mr. Johnson refused to proceed with further investigation or the bringing of this suit on behalf of MLI. Mr. Johnson demonstrated, by these and other actions, that this refusal was not an action taken in good faith and for the best interests of MLI, but rather was in conflict with MLI's interests and only for Mr. Johnson's own personal interest.

70.     Plaintiffs therefore properly bring this derivative action for and in the name of MLI. Plaintiffs will adequately and fairly represent the interests of MLI and its other owners in enforcing and prosecuting its rights.

### DEFENDANTS' AGENCY, ALTER EGO AND DIRECT LIABILITY

71.     At all relevant times, and as applicable to all preceding allegations, Mammoth, Cobra, and Ellison acted as principal and as agent for each other in doing the acts alleged herein. Defendants Cobra and Mammoth are jointly and severally liable for all conduct described herein. In addition, or further in the alternative, Mammoth, Cobra, and Ellison were engaged in a joint venture or joint enterprise in doing the acts alleged herein. At all relevant times, Mammoth controlled the operations and conduct of Cobra and Ellison such that lines were blurred between Cobra's and Mammoth's corporate existence.

72.     Each of Mammoth, Cobra, and Ellison had actual knowledge of the reasonable business expectancies and the contractual relationship between Foreman and PREPA, and the

wrongful acts of each other. Each ratified, approved, joined in, acquiesced, or authorized the wrongful acts of each other. Each retained the benefit of these wrongful acts.

73.     Cobra is a wholly owned subsidiary of Mammoth and its financial information is included within Mammoth's consolidated financial statements. Cobra and Mammoth share a principal place of business, at 14201 Caliber Drive, Suite 300, Oklahoma City, Oklahoma, and the roles of Mammoth and Cobra executives were interchangeable with respect to Cobra's operations. Cobra and Mammoth also share a web address.

74.     An October 29, 2017, news article reported that, when reached by phone for comment about Cobra's Emergency Master Services Agreement,

> Ellison defended his company's contract while noting that he could only speak in a personal, unofficial capacity. "We felt we had a really good package put together that would provide for the community without taking needed resources away from the island," he said, characterizing his company's relationship with PREPA as a "standard bidding process for a storm contract." Ellison deferred official comment on specific contractual language to Mammoth representatives.

The article continues, quoting Mammoth CEO Arty Straehla:

> "The contract is with PREPA," he said, but "in the room every step of the way was FEMA, so that it does comply with FEMA reimbursement requirements; so quite honestly, we wouldn't have entered this contract if we didn't think we'd get paid. We feel very, very strongly about that." Asked if the company faced any risk from milestones to meet or other contract terms, Straehla was unequivocal. "No," he said. "Certainly you spend a lot of time on the upfront contract, some all-night drafting sessions and that type of thing ... but we wanted to make sure that we got paid. "

75.     After announcing the award of the Emergency Master Services Agreement, on October 20, 2017, Mammoth held a conference call with analysts. Straehla and Mammoth CFO Mark Layton participated on this conference call, along with Donald Peter Crist, Mammoth's Director of Investor Relations. During the conference call, Straehla stated in pertinent part:

> As the press release states, Mammoth signed a contract worth up to $200 million in revenue over the next 120 days. We expect this to be ongoing work after that point

in time. We hope this leads to additional work in rebuilding the infrastructure for the emergency situation.

Our team has been in Puerto Rico for the past week, and I personally was in Puerto Rico over the past weekend, and I can tell you firsthand that there is a dire need for this aid. Most of Puerto Rico's population is currently living without power. We intend to work quickly to restore power and a sense of normalcy to the people of Puerto Rico.

Under the terms of the contract, we will provide construction services to restore the transmission and distribution networks and substation infrastructure. Cobra will provide a self-contained solution to the citizens of Puerto Rico aid in their time of need.

To accomplish this without being a burden on -- an already strained society, we will provide accommodations, freshwater generation and our own medical facilities for our workers. We have personnel performing an additional -- an initial damage assessment with construction crews and equipment set to be mobilized to the island in the coming days. We anticipate having our full complement of personnel and utility construction equipment in Puerto Rico shortly.

76.     In response to a question from an analyst about the Company's "margin expectations," Layton responded in pertinent part:

…we expect that this contract will have a significant impact on both Q4 '17 and Q1 2018. Further, we look forward to discussing our Q3 results in the coming weeks. We're in the preliminary assessment of damage and there are a number of variables and storm work but we expect this to be accretive to our corporate margin.

77.     In response to a question from an analyst as to what "the payment terms [are] going to look like," Straehla responded:

This contract included a $15 million upfront payment and from that point -- and then we also put in the contract that it will be -- we will be paid -- we will bill twice weekly. And the contract is with a PREPA, but it was drafted and -- in the room every step of the way with FEMA. So there is -- it does comply with FEMA reimbursement requirements. So -- and quite honestly, we wouldn't have entered this contract if we didn't think we would -- if we didn't think we'd get paid. And we feel very, very strongly about that. And again, we negotiated the $15 million payment upfront to start with the mobilization efforts.

78.     In addition to executing the Emergency Master Services Agreement with PREPA, Mammoth CEO Straehla also represented and signed on behalf of Cobra in all five amendments to that contract.

79.     In a January 19, 2018 Mammoth press release, Mammoth CEO Straehla stated the following:

> We are honored to be chosen to help restore the electric utility infrastructure for the residents of Puerto Rico. After witnessing the destruction from Hurricane Maria firsthand last weekend, where 85% of Puerto Rico's residents are currently living without electricity, we intend to work quickly both to help rebuild the electric grid and to help restore normalcy to people 's lives.

The release further announced that Cobra's contract "will be incremental to Mammoth's existing energy service operations."

80.     Mammoth's January 31, 2018 SEC Form 8-K disclosed that, on January 28, 2018, "Cobra and PREPA amended the Initial PREPA Contract to increase the total contract amount by an additional $245.4 million to a total of $445.4 million."

81.     Mammoth's 2018 First Quarter 10-Q disclosed that "During the first quarter of 2018, we executed two amendments to the [PREPA] contract, increasing the total contract value to $945.4 million from $200.0 million originally." This included Amendment No. 5 to the First PREPA Contract, entered into on February 27, 2018, which increased the total value of the contract by an additional $500 million. Mammoth CEO Straehla and Ellison represented Cobra together in executing Amendment No. 5 and both signed the amendment on Cobra's behalf.

82.     Mammoth issued a press release announcing the RFP77844 Master Services Agreement Contract executed with PREPA on May 29, 2018, titled "Cobra Signs New $900 million Contract to Finish the Restoration of Critical Electrical Services and Support the Initial

Phase of Reconstruction of the Electrical Utility System in Puerto Rico." The press release stated in pertinent part:

**Request For Proposal (RFP) Process**

In mid-February, the Commonwealth of Puerto Rico began a competitive RFP bid process (RFP #77844) to complete the restoration of critical electrical system components and to support the initial reconstruction phase of its electrical utility system following the impact of Hurricane Maria. This process involved the submission of bids from qualified infrastructure construction companies and an analysis by PREPA of each bidder's experience, asset base, financial capacity, understanding of the project and overall cost to perform the work needed. After concluding the selection process, Cobra entered into a contract with PREPA on May 26, 2018.

**Restoration and Reconstruction Contract**

Arty Straehla, Mammoth's Chief Executive Officer, stated, "We are very proud of our Cobra team in Puerto Rico. Through the team's hard work, professionalism and technical ability, we have been selected to lead this very important effort to complete the restoration phase and transition to the reconstruction phase of the electric utility system in Puerto Rico, which is expected to last for several years. The reconstruction of the electric utility infrastructure will improve the reliability and quality of service for the citizens of Puerto Rico."

The press release, along with a copy of the Second PREPA Contract were included as exhibits to Mammoth's Form 8-K filed with the SEC on May 31, 2018.

83.    Mammoth's 2019 financials reflect receivables from PREPA.

84.    Mammoth CFO Mark Layton, on at least one occasion in March 2019, traveled to Puerto Rico on behalf of Mammoth to collect funds purportedly owed by PREPA.

85.    When Mammoth issued a statement regarding the work performed in Puerto Rico on June 7, 2019, it characterized its role in the restoration project as follows: "Following Hurricane Maria in Puerto Rico and its complete destruction of the island's power grid, Mammoth, through its wholly owned subsidiary Cobra, made a proposal to do reconstruction work to help restore power and rebuild Puerto Rico's grid."

86.     Mammoth's August 3, 2021 Form 10-Q states that Cobra is owed approximately $227 million for from PREPA for services performed. In addition, the 10-Q shares that on July 23, 2021, Mammoth helped PREPA file an appeal for $47 million dollars owed to PREPA by FEMA.

87.     Mammoth's October 1, 2021 press release stated that "[a]s of August 31, 2021, Mammoth, through Cobra, is owed $325 million including $98 million in interest charges, as specified in the contract, on remaining invoices for work it has already completed."[5]

88.     Mammoth and Cobra are vicariously and/or jointly and severally liable for the acts or omissions of Cobra and Ellison, and especially inasmuch as a joint venture or joint enterprise existed among them and they are corporate alter egos of each other.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### (Civil RICO - 18 USC § 1962(c) and (d))

89.     MLI restates and realleges each of the foregoing paragraphs as though fully set forth herein.

90.     For the purpose of MLI's Civil RICO claim, MLI is a person within the meaning of 18 USC § 1961(3).

91.     At all relevant times hereto, MLI was a person injured in its business or property by reason of the violations of RICO within the meaning of 18 USC § 1964(c).

92.     Both Mammoth and Cobra are persons within the meaning of 18 USC §1961(3), and are considered members, associates, and participants in the Mammoth Enterprise.

---

[5]     *See*     https://www.prnewswire.com/news-releases/mammoth-energy-releases-verbatim-testimonials-from-former-fema-and-prepa-officials-supporting-the-vital-work-done-in-the-aftermath-of-hurricane-maria-yet-325-million-still-unpaid-by-prepa-as-of-august-31-2021-301389476.html (last viewed Dec. 23, 2021).

93.     Defendants, Ellison, Tribble, and Patterson conspired to and operated as an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Mammoth Enterprise" or "Enterprise"), for the purpose of exchanging bribes and other consideration and promises in return for the award of PREPA contracts, to the exclusion and detriment of MLI and other non-conspiring contractors.

94.     Defendants along with others engaged in conduct as members or associates of the Mammoth Enterprise.

95.     The conduct of Defendants constitutes a pattern of racketeering activity within the meaning of 18 USC § 1961(5) in violation of 18 USC § 1962(c).

96.     The acts of racketeering were related to each other by virtue of a common group of participants, a common group of victims: MLI, Foreman, the United States, Puerto Rico, and other contractors who did not participate in the scheme, and with the common purpose and result of causing PREPA to assign restoration tasks to Cobra to the exclusion of other contractors, including MLI and Foreman, and enriching Defendants through illegal profits and revenue.

97.     Defendants agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 USC § 1962(d).

98.     Defendants committed and caused to be committed the acts set forth herein in furtherance of the scheme and conspiracy.

99.     As alleged in the Indictment, the racketeering activity engaged included but is not limited to conspiring to commit bribery by giving things of value to Tribble "to influence her performance of official acts as a FEMA employee, particularly as Deputy Regional Administrator,

Secor Lead, and Recovery Manager, in connection to Cobra's contracts with PREPA related to electric power grid restoration after Hurricane Maria."

100.    This scheme provided the Defendants with illegal revenue and profits derived from these activities, as detailed above.

101.    The predicate acts involved herein include conspiracy to commit bribery and wire fraud.

102.    This pattern of activity and the conspiracy to commit same focused on PREPA awarding Cobra contracts which then excluded other contractors like Foreman and sub-contractors like MLI from receiving work from PREPA contracts.

103.    Defendants' conduct as alleged herein was the actual and proximate cause of injury to the business and property of MLI.

104.    Based upon reasonable inferences from the allegations as set forth in the Indictment, the Mammoth Enterprise associated together in an ongoing organization for the common purpose of financially enriching themselves and their friends and associates.

105.    The Mammoth Enterprise and its members engaged in, and its affairs substantially affected and involved, interstate commerce as more fully set forth above, and, as a result of its members and their agents procuring contracts with PREPA and using interstate wires to transmit communications.

106.    The Mammoth Enterprise was conducted through an overall pattern of misconduct, racketeering activity, and fraudulent concealment, which encompassed and weaved its way through a number of PREPA contracts.

107.    During the relevant time period, Ellison was authorized to act and did act for the benefit of Mammoth and Cobra in furtherance of the Mammoth Enterprise. During the relevant

time period, the Defendants that were part of the Mammoth Enterprise knowingly accepted and received the benefits from their acts.

108.    As alleged in the Indictment, Defendants committed the following violations, among others, in the course of their participation in the Mammoth Enterprise:

a.    Conspired to and participated in bribery of a public official in violation of 18 USC § 201, and

b.    Participated in wire fraud in violation of 18 USC § 1343.

109.    Defendants have engaged in a pattern of racketeering activity as defined in 18 USC § 1961(5), committing or conspiring to commit at least two acts of racketeering activity described herein, within a period of 10 years.

110.    Defendants engaged in the above-described schemes knowingly and with the intent to funnel contracts to Cobra, monopolizing and restraining competition for PREPA contracts and thereby enriching themselves by hundreds of millions of dollars at the expense of competing contractors such as Foreman and sub-contractors such as MLI.

111.    Defendants' conspiracy and actions in furtherance of the conspiracy violated 18 USC § 1962(c) and (d) and thereby directly, legally, and proximately caused millions of dollars of damages to MLI's business and property.

112.    Pursuant to 18 USC § 1964(c), MLI is entitled to recover treble damages, attorney fees and costs.

## SECOND CAUSE OF ACTION
### (Civil Conspiracy)

113.    MLI restates and realleges each of the preceding paragraphs as though fully set forth herein.

114.    Defendants entered into an illicit agreement and conspiracy to, inter alia, interfere with the Foreman contracting process and MSA and to divert funds from Foreman and MLI by giving things of value to Tribble in exchange for inside information and valuable work assignments, and to cause PREPA to funnel related restoration and reconstruction work to Defendants to the exclusion of Foreman and MLI.

115.    Defendants received illicit financial gain as a result of their conspiracy.

116.    As a proximate result of Defendants' illicit agreement and conspiracy, MLI has sustained millions of dollars of actual damages.

### THIRD CAUSE OF ACTION
### (Unjust Enrichment)

117.    MLI restates and realleges each of the preceding paragraphs as though fully set forth herein.

118.    MLI received no work arising from the Foreman Master Service Agreement.

119.    Instead, restoration and reconstruction work in Puerto Rico was wrongfully diverted to Cobra, which to date has been paid approximately $1.1 billion in FEMA funds, some of which, if not all, as a result of the corrupt relationship between Tribble and Defendants.

120.    Defendants received and accepted the benefit and enrichment of funds for work arising under RFP77844 that they received, to the exclusion of Foreman and MLI, in exchange for the value they gave Tribble.

121.    Defendants have wrongfully and inequitably retained funds for work that they caused to be wrongfully diverted to them.

122.    To date, neither Mammoth nor Cobra has made any restitution to MLI of the funds they wrongfully and inequitably retained.

123.    It is contrary to equity and good conscience that Defendants be permitted to retain these financial benefits at the expense of MLI.

124.    Based on the unjust enrichment of Defendants, an equitable order or decree requiring restitution is necessary and sought, in at least the amount of the funds Defendants diverted from MLI.

**FOURTH CAUSE OF ACTION**
**(Constructive Trust)**

125.    MLI restates and realleges each of the preceding paragraphs as though fully set forth herein.

126.    Upon information and belief, Defendants have acquired funds for work on the restoration and repair of Puerto Rico's electric grid that properly belonged to MLI. Such acquisition was wrongful as described herein.

127.    Defendants do not have any legitimate interest in the funds derived from work that would have been awarded to Foreman and MLI under the Foreman MSA. Retention of the funds would constitute unjust enrichment.

128.    MLI therefore seeks a constructive trust over the Defendants' funds that properly belong to MLI, requiring the transfer of Defendants' interests in the funds to MLI.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, derivatively on behalf of nominal defendant Machine Learning Integration, Inc. request that the Court enter judgment in their favor and against Defendants Mammoth Energy Services, Inc. and Cobra Acquisitions LLC, jointly and severally, for damages, in the form of lost profits and/or disgorgement of ill-gotten gains; for treble damages as provided in 18 U.S.C. § 1964(c); for pre- and post-judgment interest to the extent permitted by law; and for

a reasonable attorney fee and costs of this action, together with any other relief this Court deems just and equitable.

## JURY DEMAND

Plaintiffs demand trial by jury for all claims so triable.

Dated: January 12, 2022

S/Pedro F. Soler Muñiz
PEDRO F. SOLER-MUÑIZ
USDC/PR NO. 212,909
Attorney for Plaintiffs
1357 Ashford Ave.
PMB 106
San Juan, PR 00907
Tel. 787-774-6522; Fax 787-706-8680
psoler@pedrosolerlaw.com

S/Alejandro J. Fernandez Muzaurieta
ALEJANDRO J. FERNANDEZ MUZAURIETA
USDC-PR 223706
Attorney for Plaintiffs
PO Box 16264
San Juan, PR 00908
Tel. 939-337-4740
alejandrofernandezz@yahoo.com

S/Alejandra C. Martínez Méndez
ALEJANDRA C. MARTINEZ MENDEZ
USDC/PR NO. 303111
Attorney for Plaintiff
1357 Ashford Ave.
PMB 106
San Juan, PR 00907
Tel. 787-774-6522; Fax 787-706-8680
amartinez@pedrosolerlaw.com

Derek Y. Brandt*
Leigh M. Perica*
Connor P. Lemire*
**MCCUNE WRIGHT AREVALO, LLP**
231 North Main Street, Suite 20
Edwardsville, Illinois 62025
Tel: (618) 307-6116
Fax: (618) 307-6161
dyb@mccunewright.com
lmp@mccunewright.com
cpl@mccunewright.com

Richard D. McCune*
**MCCUNE WRIGHT AREVALO, LLP**

18565 Jamboree Road, Suite 550
Irvine, CA 92612
T: (909) 557-1250
rdm@mccunewright.com

*Application Pro Hac Vice to be submitted*